## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case Number: 1:21CR00239-RDM** |
| | : | |
| **NICHOLAS B. REIMLER,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, Nicholas B. Reimler, by his attorney, Ethan B. Corlija, respectfully requests that this Honorable Court impose a sentence in the above case based on consideration of all relevant factors contained in 18 U.S.C. §3553(a). Furthermore, Defendant respectfully requests that this Honorable Court impose a sentence largely reflective of the sentencing recommendation made by the United States Probation Office. *See* Sentencing Recommendation, United States v. Nicholas Burton Reimler (ECF Doc. 33). The sentencing recommendation endorses a two (2) year term of probation as being sufficient to address the goals of sentencing. *See* Sentencing Recommend'tion (ECF Doc. 33 at pg. 2). The recommendation lists several mandatory and standard conditions of probation supervision; recommends that restitution be made in the amount of $500.00; and that a monetary Fine be ordered in the amount of $3,000.00. *See* Sentencing Recommend'tion, (ECF Doc. 33

1

at pgs. 4-6).  Defendant agrees with the sentencing recommendation proposed by the United States Office of Probation in that a term of home detention as sought by the Government is not warranted in this case.[1]  Defendant also requests that the Court consider a minimal term of probation supervision and smaller monetary penalty.  In support, Defendant states:

## **Introduction**

Nicholas Burton Reimler entered a plea of guilty before this Court on September 17, 2021, to the offense of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G).  The offense was charged as Count Three (III) of an Information which the Government filed against Defendant on March 22, 2021.  *See* Information (ECF Doc. 6).  There

---

[1]  The United States Office of Probation Recommendation in the Final Presentence Report (PSR) contains a provision pertaining to social media use restriction.  The provision reads "you shall not access, view or use any online social media, chat services, blogs, instant messages, SMS, MMS, digital photos, video sharing websites, e-mails or any other interactive, online, or electronic communication applications or sites without the approval of the probation officer."  Reimler has not been active on any platform of social media in nearly a year.  In fact, Reimler intends to have no social media presence whatsoever moving forward.  He has already, or will, take steps to discontinue any social media, chat services, blogs, instant messages, SMS, MMS, or video sharing website use.
    However, of concern, is that Defendant relies heavily on the use of electronic mail (e-mail) for purposes connected directly to his employment as a civil engineer.  It would serve as an unmanageable hindrance for Defendant not to be permitted use of or access to electronic mail (e-mail).  Therefore, Defendant is seeking to have any social media restriction that may be imposed by the Court somewhat relaxed.  Specifically, Defendant requests permission to access and use electronic mail (e-mail) or any other interactive, online, or electronic communication application solely for the purpose of discharging his duties to his employer and in connection with providing his professional services to the employer, any customer or client of the employer, and to enable research and collaboration with other individuals during the course and within the scope of his employment.

is a written plea agreement in the case. *See* Presentence Report (hereinafter referred to as PSR), ¶66; Plea Agrmn't (ECF Doc. 25). The parties agree that the United States Sentencing Guidelines (U.S.S.G.) do not apply to the Defendant's sentencing. *See* PSR, ¶65. The Defendant agrees to pay restitution through the Clerk of the Court for the United States District Court for the District of Columbia in the amount of $500.00 as requested by the Government in the plea agreement. *See* PSR, ¶66; Plea Agrmn't (ECF Doc. 25 at pg. 6).

Pursuant to U.S.S.G. §1B1.9, the United States Sentencing Guidelines do not apply to any count of conviction that is a class B or C misdemeanor or an infraction. The offense to which Mr. Reimler pled guilty is classified as a Class B misdemeanor. 18 U.S.C. §3559(a)(7). The statutory maximum jail sentence is fixed at imprisonment for not more than six (6) months. 40 U.S.C. §5109(b).

Mr. Reimler is eligible for up to five (5) years of probation because the offense is a misdemeanor. 18 U.S.C. §3561(c)(2). In addition to mandatory and discretionary conditions of probation supervision pursuant to 18 U.S.C. §3563(a) and (b), the Court may impose other conditions as part of a sentence as they relate to the nature and circumstances of the offense and the history and

3

characteristics of the Defendant.   18 U.S.C. §3553(a)(1). Probationary conditions imposed as part of a sentence should also reflect the seriousness of the offense and promote respect for the law while providing a just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the criminal actor, and provide the criminal actor with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.   18 U.S.C. §3553(a)(2)(A),(B),(C),(D).

The Court may assess a maximum monetary Fine in the amount of $5,000.00.   18 U.S.C. §3571(b)(6).

A special assessment of $10.00 is mandatory.   18 U.S.C. §3013(a)(1)(A)(ii).

Further, as a condition of probation, Mr. Reimler may be required to make monetary payment of restitution pursuant to 18 U.S.C. §3663, to the extent agreed to by the parties in a plea agreement.   18 U.S.C. §3663(a)(3).   *See* Plea Agreemn't (ECF Doc. 25 at pg. 6).

This is not a case that warrants a term of imprisonment. Further, this is not a case that warrants a term of home confinement as suggested by the Government.   The Government has agreed through communication with defense counsel as well as its own Sentencing Memorandum filed with the Court that there is no

4

objection to Defendant being sentenced to a term of probation with the imposition of mandatory and, or discretionary conditions of probation that include completion of sixty (60) community service hours and payment of monetary restitution in the amount of $500.00.[2]  *See* Government's Sentencing Memorandum (ECF Doc. 31).

According to the Statement of Offense (hereinafter referred to as SOF) which was filed with this Honorable Court on or about September 17, 2021, during Mr. Reimler's plea of guilty, Reimler's participation can be summarized by his attendance at the rally on January 6, 2021, located in and around the United States Capitol building and his prior posting of social media messages and photo screenshots containing the language "JANUARY SIXTH, SEE YOU IN DC!".  *See* SOF, ¶8.  Further, the Statement of Offense specifies that Reimler was observed on surveillance video in the Crypt of the Capitol, which is a restricted area and which was not open to the public on the date in question.  Reimler remained in the Crypt for

---

[2] The Government proposes in its sentencing memorandum that Defendant, as a condition of a three (3) year term of supervised probation, complete a two (2) month period of home detention.  Defendant objects to the Government's assertion that a period of home detention is warranted in this case.

The Government's own sentencing memorandum concedes "based on a review of CCTV footage, it does not appear that Reimler was present for any violence or destruction of property in the Capitol building, nor was he present for any clashes with law enforcement.  There is also no evidence that he advocated or encouraged anyone to engage in acts of violence or destruction of property".  A sixty (60) day term of home confinement would be overly punitive.  The Government, at times, has argued in other cases that incarceration or a period of home detention should be reserved for criminal actors that engaged in violent, assaultive, or damaging and harmful behavior during the riot.  This case, and Defendant's conduct, lacks any indicia of destructive, harmful, or violent behavior.

a matter of a few minutes (less than twenty (20)) and took videos of rioters in the Crypt which he subsequently uploaded to a Snapchat social media account. *See* SOF, ¶8. During his immediate and ongoing cooperation with law enforcement, Reimler turned over evidence of his social media posts which showed an additional screenshot of a Snapchat video that displayed a banner across the bottom which said "Top of the US Capitol Dome, Washington, DC.". *See* SOF, ¶8. The social media posts indicated that the videos and screenshots were posted on January 6, 2021. *See* SOF, ¶8.

It is undisputed that Reimler took part in the protest at the United States Capitol on January 6, 2021. Moreover, Reimler agreed with the content of the Statement of Offense which was filed with the Court and which served as the basis for his plea of guilty in the case. Reimler does not shirk responsibility for his actions. He was fully cooperative with law enforcement officials from the inception of their investigation up to and including its finality. Mr. Reimler granted law enforcement immediate and open access to his social media accounts and all cellular mobile devices which he possessed and, or any other electronic device which he owned and which was requested by law enforcement. If a sentence in the case was based in part on the advisory United States Sentencing Guidelines (U.S.S.G.), Reimler would be credited fully for timely acceptance of responsibility. However, the United States

Sentencing Guidelines (U.S.S.G.) do not apply and are not used to configure an appropriate sentence in the case given that the offense is a Class B misdemeanor. U.S.S.G. §1B1.9. Therefore, when sentencing a Defendant in a position identical or similar to Reimler's in the current case, a District Court must consider all sentencing factors enumerated in 18 U.S.C. §3553(a). <u>United States v. Harris</u>, 490 F.3d 589, 593 (7th Cir. 2007).

## **<u>Analysis</u>**

### **<u>18 U.S.C. §3553(a)</u>**

In a case such as this, where United States Sentencing Guidelines (U.S.S.G.) do not apply and the Court considers sentencing factors listed in 18 U.S.C. §3553(a), the goal is to arrive at a punishment that is "sufficient, but not greater than necessary, to comply with the purposes set forth" by the factors enumerated in 18 U.S.C. §3553(a). This is the provision that serves as "the guidepost for sentencing decisions post <u>United States v. Booker</u>." <u>United States v. Ferguson</u>, 456 F.3d 660, 667 (6th Cir. 2006).

### **<u>18 U.S.C. §3553(a)(1)</u>**

Pursuant to 18 U.S.C. §3553(a)(1), the Court is directed to consider as part of its sentencing analysis "the nature and circumstances of the offense and the history and characteristics of

7

the defendant."

*Nature and Circumstances of the Offense*

As stated earlier, Reimler entered a timely plea of guilty to Count Three (III) of the Information filed against him by the Government.  *See* Information (ECF Doc. 6).  Count Three (III) charged the offense of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G). Pursuant to the plea agreement negotiated with the Government and communicated to Defendant, the Government would dismiss Count One (I) and Count Two (II) of the Information.  Count One (I) charged the offense of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. §1752(a)(1).  Count Two (II) charged the offense of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. §1752(a)(2).  Reimler pled guilty to the conduct described in the Statement of Offense filed with the Court.  *See* SOF (ECF Doc. 26).

It cannot be understated that the events which took place at the United States Capitol on January 6, 2021, were despicable acts of violence and served to undermine the electoral process--a fundamental bedrock of democracy--a principle on which the United States of America was founded.  Some of the acts which took place during the riot at the United States Capitol on January 6, 2021, led to serious injury or death to others.  The United States

Capitol Police and other law enforcement groups valiantly defended one of this nation's most sacred buildings against an attack which was made even more abhorrent given that it was undertaken by United States citizens or individuals residing within the country's borders.

From the outset, Mr. Reimler was shocked that a political rally descended into a violent confrontation inside and on the front steps of the United States Capitol building.  Reimler witnessed individuals force entry into the building and attempt to disrupt a normal and necessary function of Government performed by duly elected representatives.

It is important to note that Reimler himself never took part in any act which would have caused intimidation, fear, or harm to anyone.  He never engaged in conduct which was destructive in any form.  Reimler does not take issue with the fact that he was a person in the crowd that was not lawfully authorized to enter or remain in the Capitol building and, that prior to his entry, no members of the crowd submitted to security screenings or weapons checks by United States Capitol Police Officers or other authorized security officials.  *See* SOF, ¶5.  In the moments of chaos, Reimler followed along with other individuals that entered the building. Notably, Reimler's entry into the building was peaceful through an exterior door that was open.  At no time did he destroy or break any property or item within or without the Capitol building.

As written in the Statement of Offense filed with the Court, seven (7) days prior to the riot, on December 30, 2020, Reimler posted a screenshot of a social media message from then President Trump's Twitter account which stated "JANUARY SIXTH, SEE YOU IN DC!". *See* SOF, ¶8.  The words were *not* Reimler's.  To say the least, at that time, Reimler was eager to engage in the political process and witness the President of the United States, Donald J. Trump, address a crowd during a rally.  Reimler was not in any twisted stretch of the imagination intent on traveling to the Washington, D.C. area to take part in a protest that would include violence and destruction.  On January 6, 2021, Reimler entered the United States Capitol building and was observed on surveillance video in the Crypt of the Capitol which was a restricted area.  *See* SOF, ¶8.  He remained in the Crypt for only a few minutes.  Several other individuals were in the Crypt along with Reimler.  *See* SOF, ¶8.  He took cursory videos of rioters and posted the videos to his social media Snapchat account.  *See* SOF, ¶8.  Photo screenshots of his social media accounts were later obtained by law enforcement and were observed to display a banner that stated "Top of the US Capitol Dome, Washington, DC.  *See* SOF, ¶8.  The screenshots were posted on January 6, 2021.  *See* SOF, ¶8.  In totality, this is the conduct in which Reimler engaged.  Perhaps most notable is the absence of any act which could be deemed as destructive, harmful,

assaultive, or violent.   The Government wishes the Court to believe that Defendant viewed, at least at the time, that the breach of the United States Capitol building was "a laughing matter and Reimler was advertising his participation in the Capitol breach to his social media followers."   *See* Government Sentencing Memorandum (ECF Doc. 31 at pg. 7).   This assertion could not be more misguided.   Defendant was shocked at what he was witnessing take place in the building.   Reimler was uneasy and nervous and did not know exactly how to convey his feelings of disbelief.   The photo screenshots which he posted on social media as the event took place were followed up by the single and simple three (3) word statement, "LOL What's going on?"   *See* Government's Sentencing Memorandum (ECF Doc. 31 at pg. 7).   Reimler has always held that he should be fully accountable for all acts in which he engaged and which were unlawful on that fateful day.   However, the opposite is also true.   He should not be held as culpable as individuals that committed acts of violence, assault, harm, and destruction.   It is simply not within his nature to commit any acts which would pose harm or a threat to anyone or anything.

It is important to put Nicholas Reimler's own actions in full context.   That includes not only recognizing what Reimler was observed by surveillance video and others to have done, but also understanding everything that transpired during the attack.   The events of that day were chaotic as they occurred in and around the

building.  A crowd of enormous size gathered outside the building.
Temporary and permanent barricades were in place around the
exterior of the Capitol building.  United States Capitol Police and
law enforcement were present and desperately attempted to keep the
crowd away from the Capitol.  *See* SOF, ¶4.  The crowd, in a mass
frenzy, advanced to the exterior facade of the building.  *See* SOF,
¶5.  Some in the crowd breached the barricades and unlawfully
entered the building.  Reimler, acting in the moment, followed the
unorganized crowd into the building.  Once in the building, Reimler
walked the halls for a short distance and remained for a few
minutes inside the main Crypt.   Realizing that the event was
spiraling into disruption, he decided to immediately exit the
building.  At no time did he come into contact with any members of
the United States Capitol Police, lawmakers, or staffers that
worked in the building.  In fact, his presence in the building was
calm in that he was not screaming or attempting to create a
disruption.  Reimler did not go into any private office space, or
proceed to the well of the House or the Senate chambers.  Once
Reimler exited the building, he left the demonstration area and
eventually returned to St. Louis, Missouri.  It is important to
state that Reimler cooperated with law enforcement once he was
identified as an individual seen on surveillance inside the Capitol
building.  Reimler immediately took steps to communicate with law
enforcement and provided them with any and all information which

was requested of him.  He turned over his cellular telephone device and all other digital electronic devices to law enforcement to help advance further investigation and prosecution of individuals associated with the riot.  Reimler was not associated any extremist groups linked to certain aspects of what occurred that day and he was certainly not involved in planning any activity in which the crowd engaged.  Up to and including the very day that Nicholas Reimler entered a plea of guilty to the charge, he remained cooperative with Federal investigators and the United States Attorney's Office in Washington, D.C.

There would be no justice in a sentence more harsh than probation without a term of home detention for Nicholas Reimler in this case.  The facts of the case would not support such an outcome--certainly not based on Reimler's comparative role.  The attack on the Capitol should not have happened and Reimler is not blameless.  However, hundreds of individuals share responsibility for what occurred.  Some of those who are culpable may escape justice altogether, while a few will have their wrists slapped. Just because many other culpable individuals involved in this event may go uncharged and, or underpunished, would not serve as a legitimate reason to give Mr. Reimler any greater sentence than that as regarded as a just punishment by the United States Office of Probation in its recommendation attached to the Final Presentence Investigation Report (PSR).  *See* Sentencing

13

Recommendation (ECF Doc. 33 at pg. 2, 4, 5).

*History and Characteristics of the Defendant*

While some may say that elements of this case paint a relatively unflattering picture of Nichlas Reimler as a boastful voyeur of mayhem, it is important to recognize that he found himself in the midst of an event the likes of which is unprecedented.  None of the rioters can be noted as using common sense and good judgment.  This especially applies to Nicholas Reimler.  Reimler would be the first to admit that he wishes he could take back his presence at the January 6, 2021, riot.  He holds a great deal of remorse and personal shame for putting himself in a position where things could have escalated and a much uglier result would have ensued.  Reimler quickly realized that the event was beginning to take a form with which he strongly disagreed.  At that time, he exited the building.

Nicholas Reimler is a young man that has been raised by loving, compassionate, and involved parents.  He was taught by his parents to respect the rule of law.  This is not to say that because of his actions Reimler is a rotten apple hanging from an otherwise healthy tree.  To the contrary, he is a normal young man that, like everyone else, may demonstrate an unintended lapse in judgment from time to time.  For example, the social media communications which were posted by Reimler demonstrate at the very least poor taste.  It certainly was not wise to record or show off

14

about events taking place inside the Capitol building during the midst of a violent riot.  However, in context, modern day communication is performed largely by cellular text messaging and social media communication.  It has become so prevalent that much of what individuals say or do never goes away.  Every moment of poor judgment, irrational thought, or tasteless conduct lasts forever in an iCloud.  Nicholas Reimler's social media posts shine a spotlight on some of the poor decision making in which he was engaged on the day in question.  Still, there is much more to Mr. Reimler than irresponsible social media messages.

Attached to this memorandum are several character letters written by those who know Nicholas Reimler not just as a friend or associate, but as a valued co-worker, family member, and human being deserving of high praise for his integrity, reliability, and willingness to serve as a positive role model for others.  The Court is asked to please read the letters in their entirety. Certain passages from the letters merit special attention, however, and will be highlighted in the body of this memorandum.

Perhaps one of the best ways to measure an individual's integrity and ability to sustain quality relationships with others is to learn of their interaction with co-workers since many hours of the day are spent among them.  Mr. David B. Marshall is the Director of Quality Control for New Frontier Materials.  Mr. Reimler is employed by New Frontier Materials and has been known to

Marshall since 2016.  Mr. Marshall now serves as Reimler's direct supervisor.  In his letter addressed to the Court dated September 29, 2021, Mr. Marshall writes:

"Nicholas has been an asset to my laboratory as well as a friend and colleague."  *See* Exhibit A.

* * *

"He had shown leadership skill amongst his fellow employees and has set a great example for all of us that work with him for his drive and dedication in his professional career as well as always willing to help others with anything after work.  Nicholas is very open-minded and accepting of all others he is around regardless of their beliefs or political leanings and is always willing to listen to others."  *See* Exhibit A.

* * *

"Nicholas has been very honest and forthcoming about his case to me as both a friend and an employee and has been very humble in being responsible for his actions.  It is for that reason that I wanted to offer a more complete picture of who Nicholas Reimler is: a very good hearted, loyal, hardworking young engineer, willing to learn from mistakes with his whole life ahead of him."  *See* Exhibit A.

* * *

16

Mr. Reimler worked very hard to achieve his academic success in order to lead a productive life and become an asset for his employer.  Reimler held a few different jobs including being an inspector in the Materials Department for the Missouri Department of Transportation before becoming employed in the Quality Control Department for Fred Weber, Incorporated (later New Frontier Materials, Incorporated).  *See* PSR, ¶s 54, 55.  Since July 2020, Reimler has been employed in the Quality Control Department for New Frontier Materials, Incorporated.  The company is a construction material supply company.  *See* PSR, ¶53.  Mr. Reimler attended the University of Missouri at Columbia where he majored in Civil Engineering.  A record of his academic transcripts reflects that he possessed a cumulative grade point average of 3.693.  *See* PSR, ¶49. He is also certified as a Mine Safety and Health Administration Inspector through the United States Department of Labor and received his engineering license through the Missouri State Professional Board of Engineering.  *See* PSR, ¶51.  It is easy to see how Reimler can serve as an asset to his employer.  He is a bright, hardworking person.  Along with all of the academic accolades and professional accomplishments, it is important to see that Mr. Marshall's character letter describes Reimler as a very good hearted, loyal and hardworking young engineer.  It is apparent that Mr. Marshall values Reimler as more than just a work

17

colleague.   Marshall sees that Reimler demonstrates admirable traits that are possessed by people who exhibit compassion and understanding towards others.   Mr. Marshall holds Reimler in high regard as a quality human being who is capable and willing to learn from mistakes made during the course of his life in order to become a better person and not one destined to repeat mistakes.

Another character letter submitted by Mr. Steven D. Rosenthal, a Quality Control Manager for New Frontier Materials, Incorporated states that he was most impressed with Nicholas's "punctuality, attention to detail, personal relations skills, [and] positive attitude ... ".   *See* Exhibit B.   Mr. Rosenthal's letter goes on to state:

> "[Remler's] intelligence showed what a great employee and fine young man he is."   *See* Exhibit B.

* * *

> "While working as Nick's immediate supervisor for the last 3+ years, I have gotten to know him quite well. Nick is very reliable and always delivers on promises. Nick has been an extremely valuable addition to our team, and has proven to be an excellent colleague and friend. *See* Exhibit B.

* * *

Again, a supervising co-worker reflects on Reimler's quality as an individual.   He comments on Reimler's reliability and value

as a person.  He echoes Mr. Marshall's view that Nicholas is an excellent colleague and friend.  *See* Exhibit B.  Moreover, he reiterates the fact that Nicholas uses every opportunity to learn and that he is considered a huge asset to his employer.  *See* Exhibit B.

Suffice it to say that Mr. Reimler is a greatly valued member of his company and circle of peers.  Many individuals including his supervisors referenced above see Nicholas as someone who possesses wonderful, desirable attributes--ones to be mirrored by others.

In describing Reimler's personal and family background, it can be stated that he was raised under modest economic circumstances. *See* PSR, ¶32.  He has always cherished the time spent with his mother and father and shares a very close familial relationship with them as well as his sister.  *See* PSR, ¶s 32, 34.  Some of the greatest memories of his upbringing include simple moments which involved fishing trips with his family and spending time with loved ones that instilled in him positive virtues and values.  The lessons he learned as a young man from his hardworking family will never be forgotten.  Nicholas' mother and father, Dana and Gary Reimler, write to the Court in glowing terms about Nicholas.  His mother writes in a letter of support addressed to the Court on November 21, 2021:

"Nick grew up in a stable and loving home with his sister, father, and I."  *See* Exhibit C.

19

* * *

"Nick has always been a caring and loving son to his father and I. This past summer and fall, my husband has been going through some medical issues and we have relied on Nick's help with the lawn and other chores." *See* Exhibit C.

* * *

Still, Nicholas' father, Gary Reimler, reinforces the virtues that have been instilled in Nicholas by his family. His father writes in his letter of support addressed to the Court dated November 22, 2021, that he has observed Nicholas as being someone that "was raised to respect others, be compassionate for those less fortunate, and appreciate what life has given him." *See* Exhibit D. Further, he reiterates:

"His life is on target to continue to be a constructive citizen who respects the law and understands he has been blessed in his life and the importance to have compassion for others" *See* Exhibit D.

* * *

While Nicholas is blessed to have such loving and caring parents, he realizes that demonstrating the positive virtues that he has been taught means that he must lead a life devoid of selfishness, closed mindedness and intolerance for those will be the values which he certainly hopes to ingrain in any children of his own.

20

Mr. Reimler hopes to soon start a family of his own. Since November 2018, he has been involved in a romantic relationship with his fiancé, Ms. Kennedy Sonsoucie. In July 2021, they got engaged to be married. They plan to be married in November 2022. *See* PSR, ¶38. Ms. Sonsoucie is a nurse at a local hospital in the St. Louis, Missouri area. Ms. Sonsoucie knows Mr. Reimler as deeply as anyone could. Ms. Sonsoucie remains very supportive of him. She looks forward to starting her family with him and having him instill all of the values he was taught as a child in their own children. It goes without saying that Ms. Sonsoucie would like her children with Nicholas to one day be described as he was when he was a young man and remains as an adult. That is, to name only a few: hardworking, very likeable, very conscientious, generous, and kind.

Finally, a life-long friend of Nicholas' chose to write a letter of support for him addressed to the Court dated December 1, 2021. Ms. Nancy Vogel has known Nicholas since he was freshman in high school. Ms. Vogel's letter is illustrative of Nicholas' open mindedness. Ms. Vogel does not share an interest in the same political party with Nicholas and has found him an unprejudiced and dear friend. Ms. Vogel writes:

"I have known Nick Reimler since he was a freshman in high school....I just knew in my heart that he would grow up to be a kind, thoughtful, and successful person. *See*

Exhibit E.

\* \* \*

"I have interviewed and hired many a person in my
lifetime, and think I am a pretty good judge of character
since all but one turned out to be employees that I would
have hired again.  My admiration for Nick's character
continued throughout his college years, and is still in
place today, despite the January 6th incident at the
Capitol.  I am a life-long Democrat, and was very
surprised to learn after-the-fact that Nick had traveled
to Washington, DC, to participate in the gathering of
Trump's supporters.  I express surprise because he has
never been a loudly opinionated person.  Based on his
consistent demeanor throughout the years, I firmly
believe he had no intent to participate in the violence
or the attempt at insurrection that ensued.  He was, in
his mind, exercising his right to protest - perhaps
loudly given the nature of these particular supporters -
but peacefully.  *See* Exhibit E.

\* \* \*

Ms. Vogel goes further to encourage leniency in any sentence
imposed by the Court.  Ms. Vogel writes:

"I am writing in hope that he not be further punished, as
the charges against him have weighed heavily upon him."

22

*See* Exhibit E.

\* \* \*

"More importantly, he is the proverbial nice guy.  He may
be guilty of not having been in good company at that one
moment in time, but he is far from a thuggish person.  He
has been on the path of being an upstanding citizen, and
I think he is deserving of leniency."  *See* Exhibit E.

\* \* \*

Nicholas Reimler never once has been accused of being a
violent or troublemaking individual.  His criminal history is
unremarkable.  Although he was arrested in 2014 for suspicion of
Driving While Intoxicated (DWI) while in college, he was never
convicted of the charge.  *See* PSR, ¶s 29, 47.  Reimler does not
engage in persistent or excessive alcohol use and does not use
illicit controlled substances on a recreational basis or otherwise.
*See* PSR, ¶s 46, 47, 48.

## 18 U.S.C. §3553(a)(2)(A)(B)(C)&(D)

18 U.S.C. §3553(a)(2)(A) directs the Court to consider "the
need for the sentence imposed to reflect the seriousness of the
offense, to promote respect for the law, and to provide just
punishment for the offense."

The gravity of the events of January 6, 2021, cannot be
diminished.  The country suffered an indelible scar and the event

revealed the larger problem of a potentially violent political rift among fellow countrymen. The division may be accurately categorized as a societal ill once it rose to the level of violence and destruction as seen on January 6, 2021. Mr. Reimler only requests that the Court weigh the seriousness of *his* personal conduct on January 6, 2021, rather than the collective mayhem which occurred. A just punishment and reinforcement of the axiom that respect for the law is paramount in this case would dictate that Reimler be sentenced to a monetary Fine and, or, to a term of probation with no condition of home confinement. Society and the rule of law demand that there are consequences for acts of lawlessness. However, respect for the law is never achieved by harsh or draconian measures. The United States Supreme Court has warned that excessive sentences "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall v. United States, 553 U.S. 38, 54 (2007). This is precisely the reasoning behind 18 U.S.C. §3553(a)'s primary rule of thumb; that a sentence be sufficient, but not greater than necessary, to achieve these aims. Arguably, to sentence Defendant to a term of home confinement, no matter how brief a period, would only serve to create hardship for Defendant, his family, and his employer. The Government's suggestion that he serve a sixty (60) day term of home

confinement is excessive and inappropriate in this case.  Such a sentence would jeopardize Mr. Reimler's employment and ability to contribute to his family and earn a living.  Such a sentence would disregard the real conduct and circumstances involved in Reimler's situation.  The Government's Sentencing Memorandum cites that Reimler has several characteristics in his life that exhibit stability.  Such characteristics are his form of employment, his familial relationships, and his financial position.  The Government argues that despite these characteristics of stability Reimler engaged in a breach of the United States Capitol.  Therefore, the Government argues Reimler should serve a period of home detention and lengthier period of probation (three (3) year term of supervised probation).  What is most telling is that the Government does not consider that a sentence of home confinement would serve only to weaken the characteristics of stability which are cited.  If Reimler is sentenced to a term of home confinement and loses his job, his employment stability is significantly weakened.  If Reimler is sentenced to a period of home detention and is unable to provide for his family, his financial stability is weakened.  If Reimler is unable to assist his parents and other family members with household duties because he is sentenced to a term of home confinement, his familial stability is weakened.  Therefore, it can be argued that the Government's position is shortsighted and may lead to consequences intended to be avoided altogether.

18 U.S.C. §3553(a)(2)(B) and (C) addresses the need for a sentence to "afford adequate deterrence to criminal conduct...[and]...to protect the public from further crimes of the defendant."

Specific deterrence and the need to protect the public from further crimes committed by Defendant, Nicholas Reimler, are not great concerns in this case. Reimler is not the type of man who spent his life on the wrong side of the law. Notwithstanding what happened on January 6, 2021, and irrespective of his arrest in 2014 for Driving While Intoxicated (DWI), Nicholas Reimler is a person that spent his entire young and adult life following laws and not breaking them. Reimler is unlikely to be involved in any future criminality. He has a profession which is held in high regard and requires an individual to exhibit high moral character and good judgment. Nicholas Reimler poses no danger to the public. To the contrary, those that know Reimler paint him as a supportive individual, someone who is quick to learn from mistakes, lend a helpful hand, and one that makes it a point to be kind and compassionate to others.

The larger issue is general deterrence. This case has been one of many impactful to the belief that no political disagreements should rise to the level of mob violence. It highlights the deep division between those with differing political loyalties. To most people that were involved and that are unaccustomed to breaking the

law, the idea of being prosecuted and going to prison is terrifying. In a case like this where Reimler engaged in no disruptive, harmful, assaultive, or outrageous conduct by the Government's own admission, and still faced criminal prosecution with the potential for a significant penalty to be imposed, raises concerns on many different levels. Nicholas Reimler is *not* asking the Court to spare him any consequence at all for his conduct. Rather, a sentence limited to payment of a monetary Fine, restitution, and a term of probation with no period of home confinement will achieve absolute deterrence in his case. This belief is shared by the United States Office of Probation. The recommendation of the Final Presentence Investigation Report (PSR) concludes "A probationary sentence would serve to protect the community and fulfill the goals of deterrence and punishment for the defendant." *See* Sentencing Recommendation (ECF doc. 33 at pg. 2). Any other outcome would be greater than necessary to achieve sufficient deterrence based on Reimler's actions.

18 U.S.C. §3553(a)(2)(D) addresses education and vocational training, medical care, and other correctional treatments.

The Federal Bureau of Prisons and United States Office of Probation deserve endless praise for their extensive programming to help individuals in vocational pursuits and obtain adequate medical care or address controlled substance abuse issues. Some offenders who never really learned a legitimate trade can find one during

incarceration or probation supervision.  Educational and vocational training programs exist because of a recognition that the ability to find gainful employment is a substantial stride towards rehabilitation once an individual is released from confinement or probation.

Nicholas Reimler already possesses a high-level professional skill that promotes value to society.  His certifications as a Mine Safety and Health Inspector coupled with his specific performances as a civil engineer allow him to be a productive citizen in society.  The Court is asked to please consider this in arriving at a sentence which would only include the imposition of a monetary Fine and a term of probation <u>excluding</u> a home detention condition and in reasoning that such a sentence would be no greater than necessary to meet the ends of justice.

## 18 U.S.C. §3553(a)(6)

The Court is directed to consider the need to avoid unwarranted sentence disparities among defendants with similar records to have been found guilty of similar conduct in determining a particular sentence to be imposed.  *See* 18 U.S.C §3553(a)(6).  The task of avoiding unwarranted sentence disparities among defendants in the case at hand is assisted by reviewing some specific examples of sentences imposed by the Court against defendants that have pled guilty to violating 40 U.S.C. §5104(e)(2)(G).  This is the same section of the United States Code

Reimler pled guilty to violating.   As pointed out in the Government's Sentencing Memorandum, the Court has already begun to make meaningful distinctions between offenders.   *See* Government Sentencing Memorandum (ECF Doc. 31 at pg. 11).   Further, the Government acknowledges in its memorandum that "every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *See* Government Sentencing Memorandum (ECF Doc. 31 at pg. 14).   *Cf*.   United States v. Gardellini, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

To illustrate that a sentence comprised of a minimal term of probation and a monetary Fine with no term of home detention imposed is appropriate in this case, a small sample of offense facts and resultant sentences pertaining to other individuals involved in the January 6, 2021, riot is set forth below.

First, is the case against Jessica Louise Bustle.[3]   Ms. Bustle's conduct and the sentence which she received from the Court are cited in the Government's Sentencing Memorandum.   Similarly to Mr. Reimler, Ms. Bustle entered the Capitol building and remained for approximately twenty (20) minutes.   Ms. Bustle, like Reimler, did not have permission to be in the building and was there for the purpose of protesting what she thought to be a stolen election as well as voice other concerns.   However, what is strikingly dissimilar from Reimler's conduct is that Ms. Bustle both during

---

[3] United States of America v. Jessica Louise Bustle, 1:21CR00238 (TFH).

29

the midst of the riot and immediately thereafter posted several derogatory and inciteful messages on her social media Facebook account. Some of the posts read in part "Pence is a traitor. We stormed the Capital [sic]. An unarmed peaceful woman down the hall from us was shot in the neck by cops. It's insane here." Further, Bustle posts a message which reads "We need a revolution!" Obviously, Bustle was attempting to rally rioters and create an atmosphere of resistance. In the case at hand, Reimler never once used social media in an effort to incite individuals or advance the progress of the riot. Rather, Reimler posted a few brief words about his observations that day. Not one time in his social media posts did Reimler express that the riot was legitimate and its cause noble. The main thrust for the Government's position that Reimler should serve a period of home detention and a longer period of supervised probation is that he posted some brief observations on social media accounts as the riot unfolded. Ultimately, the sentencing Court in Bustle's case decided on a period of sixty (60) days of home confinement and twenty-four (24) months of supervised probation along with forty (40) hours of community service and restitution in the amount of $500.00.

Second, is the case involving Valerie Ehrke.[4]  Ms. Ehrke's behavior during the riot is perhaps most similar to Reimler's although Ehrke's social media posts are moderately more

---

[4] United States of America v. Valerie Ehrke, 1:21-CR-00097 (PFF).

descriptive.  Ms. Ehrke entered the United States Capitol building with a large crowd.  She then entered one of the hallways of the building and took a video from a first person perspective while she was there (similar to Reimler).  She uploaded her video to her social media Facebook account with a caption reading "We made it inside, right before they shoved us all out.  I took off when I felt pepper spray in my throat!  Lol."  It is obvious that Ehrke was in an area of the Capitol where chemical pepper spray was being disbursed by Capitol Police officers.  Even more, Ehrke describes being shoved from one of the hallways of the Capitol building.  She left the building only when an unknown individual grabbed her and pushed her outside.  This does not comport with someone's realization that the event was spiraling into danger and thus voluntarily leaving the building.

In Ehrke's case, the Government did not seek any period of home detention nor did it seek a prolonged period of probation.  The sentencing Court imposed a thirty-six (36) month term of probation and ordered that Ehrke pay $500.00 in monetary restitution.  Again, it can be argued that Reimler's conduct was not as egregious.  However, the Government inexplicably feels it is appropriate to seek a term of home detention and elongated period of probation in Reimler's case.  Reimler was never in an immediate area where chemical pepper spray was being disbursed.  Reimler was never "grabbed" or "shoved" and made to leave the building.  The

opposite is true.  Reimler immediately left the building after events looked as if they may turn dangerous.  Still yet, none of Reimler's very few social media posts made commentary on what was transpiring within the building nor the actions of Capitol Police officers.

Third, a comparison of Reimler's case with that of the case filed against Anna Morgan-Lloyd is insightful.[5]  Ms. Morgan-Lloyd entered the Capitol building on January 6, 2021, with a female companion.  She participated in the protest in and around the United States Capitol building.  In what can be termed standard protocol among rioters, Ms. Morgan-Lloyd posted messages to her social media Facebook account that included photos.  In one message, Ms. Morgan-Lloyd wrote "I am here.  Best day ever.  We stormed the Capitol building me and (omitted) were in the first 50 people in.  Later in more social media messaging, Ms. Morgan-Lloyd wrote "that was the most exciting day of my life."  She further relayed "I am so glad we were there.  For the experience and memory but most of all we can spread the truth about what happened and open the eyes of some of our friends."  Morgan-Lloyd also took photographs which were uploaded to her social media Facebook account depicting her standing next to other rioters with stolen and broken property taken from within the Capitol building.

Again, it is evident Defendant, Morgan-Lloyd's, conduct during

---

[5] United States of America v. Anna Morgan-Lloyd, 1:21-CR-00164 (RCL).

the January 6, 2021, riot and even afterwards, was far more egregious than that of Reimler's. Ms. Morgan-Lloyd held the position that the actions of rioters should be rejoiced. Further, Ms. Morgan-Lloyd was thrilled to take part in the riot likening it to one of the most exciting days of her life. By comparison, Reimler never considered the riot a righteous event. Even more, he never described his actions as "storming" the United States Capitol building.

Nonetheless, the Government did not argue for a period of home detention or prolonged period of probation supervision in Ms. Morgan-Lloyd's case. The sentencing Court imposed a thirty-six (36) month term of probation as a sentence along with requirements that Ms. Morgan-Lloyd complete 120 hours of community service and pay $500.00 in monetary restitution.

In sum, Reimler did not engage in or encourage any violence or destruction of property. He remained inside the Capitol building for only a brief period of time. He made what could be categorized as very few innocuous social media posts and he was cooperative from beginning to end with law enforcement following his identification and arrest. He took responsibility for his criminal act by pleading guilty at the first opportunity that was presented to him. He provided the Government with information and evidence which quite likely could have advanced criminal prosecutions against other individuals present at the riot. Nicholas Reimler

33

will continue to express shame and remorse for his part in what transpired on January 6, 2021. All of these facts must be taken into account. The goal of minimizing unwarranted sentencing disparities prescribed by 18 U.S.C. §3553(a)(6) is "only one of several factors that must be weighed and balanced...and the degree of weight is firmly committed to the discretion of the sentencing Judge." United States v. Coppola, 671 F.3d 220, 254 (2d Cir. 2012). In this case, it would be just for the Court to sentence Defendant to a minimal term of supervised probation and impose a small monetary penalty. It would be unjust for the Court to impose a condition that Defendant serve a term of home confinement given the disparity that would be created by doing so between his conduct and that of some as mentioned above who were spared any incarceration or home confinement punishment.

## 18 U.S.C. §3553(a)(7)

The last factor under 18 U.S.C. §3553 to be considered is listed in §3553(a)(7). The factor addresses restitution. The Government recommended a restitution figure in the total amount of $500.00. *See* PSR, ¶79; Plea Agreemn't (ECF Doc. 25 at pg. 6). Additionally, pursuant to 18 U.S.C. §3663(a)(1)(A), "the Court may also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense. The Defendant does not contest the Government's efforts to seek

34

restitution nor does he contest the monetary restitution amount ($500.00).  Reimler plans to make monetary restitution in the amount ordered without delay to the victim (Architect of the Capitol, Office of Chief Financial Officer) as named in the plea agreement.  *See* Plea Agreemn't (ECF Doc. 25 at pg 6).

## Conclusion

**WHEREFORE**, the Defendant, Nicholas B. Reimler, by his attorney, Ethan B. Corlija, respectfully asks the Court to impose a monetary Fine in an amount deemed appropriate and just and to sentence Defendant to a minimal term of probation with mandatory and, or discretionary conditions deemed appropriate but <u>not</u> inclusive of home confinement.  Such an outcome will send a message in this case and deliver a real and significant punishment to Defendant.  At the same time, it will allow Defendant to continue the upward trajectory of his life's pursuits and remain a productive asset to his family and loved ones, friends, co-workers, and society in general.

Respectfully Submitted,

**ETHAN B. CORLIJA**
**ATTORNEY AT LAW**

_/s/ Ethan B. Corlija_
Ethan B. Corlija
Bar Number: MO0020
5205 Hampton Avenue
St. Louis, Missouri 63109
Telephone: 314-832-9600
Facsimile: 314-353-0181
E-Mail: ecorlija@sbcglobal.net

**ATTORNEY FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I, Ethan B. Corlija, legal counsel for Defendant herein, **NICHOLAS B. REIMLER,** certify that a true and accurate copy of the forgoing Defendant's Sentencing Memorandum has been forwarded to counsel of record for the United States of America at the following address: Ms. Janani Iyengar, Assistant United States Attorney, United States Attorney's Office, District of Columbia, 555 Fourth (4th) Street, Northwest, Washington, District of Columbia 20001, this 6th day of December 2021.

_/s/ Ethan B. Corlija_
Ethan B. Corlija
Bar #MO0020